**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 22-cr-285 (TNM)** |
| **v.** | : | |
| | : | |
| **FRANK JOSEPH BRATJAN, JR,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Frank Bratjan to 14 days of incarceration as part of 36 months of probation, 60 hours of community service, and $500 in restitution.

**I.    Introduction**

Defendant Frank Bratjan, a 28-year-old postal worker living in Minnesota, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars in losses caused by damage to the building and costs borne by the U.S. Capitol Police.

Defendant Bratjan pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence that includes a period of imprisonment is appropriate in this case because Bratjan (1)  approached the Capitol through the battle scene on the West plaza just as the building was overrun by rioters; (2) entered the Capitol through a broken window near the Senate Wing Door within the first ten minutes of the initial breach that day; (3) joined a crowd of rioters

1

who physically pushed against a line of police officers in a hallway near Senate Majority Leader Mitch McConnell's office; (4) celebrated on social media that he had "stormed up those steps and into those halls" after returning from the riot; (5) later deleted his social media posts, ensuring that they would be unavailable to investigators; but also (6) quickly took responsibility for his actions and immediately agreed to plead guilty in this case.

The Court must also consider that Bratjan's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers trying to prevent a breach of the Capitol Building and to disrupt the proceedings. *See United States v. Thomas Fee*, 1:21-cr-00131 (JDB), Tr. 04/01/2022 at 17 ("The defendant was an active participant in a mob assault on our core democratic values and our cherished institution. And that assault was intended by many and by the mob at large in general to interfere with an important democratic processes of this country. I cannot ignore that, cannot pull this misdemeanor out of that context.") (statement of Judge Bates). Bratjan's actions and those of his fellow rioters enabled the breach the Capitol, threatened the lives of police officers, legislators and their staffs, and disrupted the certification vote for several hours. Here, the facts and circumstances of Bratjan's crime support a sentence of 14 days imprisonment as part of a 36-month period of probation.

## II.       Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol contained in the Statement of Offense signed by both parties.  A riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent— contributed, directly and indirectly, to the violence and destruction of that day. With that

backdrop we turn to Bratjan's conduct and behavior on January 6.

*Defendant Bratjan's Role in the January 6, 2021 Attack on the Capitol*

Frank Bratjan traveled from his home in New York state to attend then-President Trump's "Stop the Steal" rally on the National Mall.  He attended the rally by himself, but he found what he later described to the FBI felt like a big tailgating party.  After the rally, he joined the large crowd to march on the Capitol building. In an Instagram post later that night, he described his motive for being there. He wanted to send a message to Congress: "we didn't elect them to carry out their own agenda, we elected each and every one to carry our agenda!"  Bratjan described the approach to the building as "an army of American patriots. With war vets leading the way, we stormed up those steps and into the halls."  *See* Figure 9, below (Instagram post).

He approached the building from the West lawn and made his way through a large crowd of rioters attempting to surge through the police barricades to reach the restricted Capitol building. As he got closer to the Capitol, Bratjan felt the atmosphere change, as "it started to get a little crazier."  *See* Exhibit 1 (Bratjan interview with FBI, June 14, 2022), at approx. timestamp 08:20. At about 2:00 p.m., Bratjan was a part of the mob that had gathered on the West Plaza. He saw a group of rioters working together dressed in full tactical gear, without an inch of skin showing, and saw them fight with the Capitol police officers. As Bratjan climbed the stairs, police deployed chemical irritants and took other measures to hold back the crowd. Although he saw all of this, Bratjan nevertheless continued on undeterred. He passed the line where the police had attempted to contain the crowd and reached the Upper West Terrace.  *See* Statement of Offense.  Watching this scene, Bratjan admitted he was afraid.  *See* Ex. 1, at approx. timestamp 08:30.  Bratjan's fear was a logical response to the scenes of violence, anger, and destruction that surrounded him.

But despite the clear signs of danger, Bratjan advanced on the building.  At approximately

3

2:22 p.m., he entered the Capitol by climbing through a broken window next to the Senate Wing Door—the same window other rioters had broken less than 10 minutes earlier in the very first breach of the Capitol.  Figures 1 and 2 below show Capitol Police CCTV footage of Bratjan, circled in green, climbing into the building.



*Figure 1*



*Figure 2*

Loud, high-pitched, continuous alarms, similar to fire alarms, were sounding as the mob entered. No one entering through these doors at that time could possibly have failed to understand that they were unwelcome, advancing into what should have been a secure government building that had been overrun by a violent mob willing to break windows and doors to gain unlawful access.

After entering the restricted Capitol building, Bratjan made his way to the Rotunda, the ceremonial heart of the Capitol. *See* Figure 3 (open-source footage) (Bratjan circled in green).



*Figure 3*

As he later recounted, the rioters' tone inside the building was brutal and belligerent, and Bratjan heard others shouting to find Nancy Pelosi and other Members of Congress they called out by name.

While he was inside, Bratjan joined a group of rioters attempting to press forward through a narrow hallway toward Senator Mitch McConnell's offices, on the second floor, north of the Rotunda. The crowd crushed forward, attempting to break the line of riot police determined to stop their progress toward McConnel's office the Senate floor. The battle went on for several

minutes, as rioters screamed and chanted, "Fuck McConnell!" and "the police work for us!"  Video of this harrowing incident includes the sounds of the mob yelling, "Push!", encouraging others to help force the officers back.  Bratjan can be seen at this time, several rows of people away and several feet away from the officers.  *See* Exhibit 2 (available at https://www.newsflare.com/video/402653/mob-incited-by-trump-storms-interior-of-capitol-including-offices-of-mcconnell-and-pelosi-in-terrifying-act), at approx. timestamp 00:17, *and see* Figures 4, 5, below (excerpts from Exh. 2) (Bratjan circled in green).



*Figure 4*



*Figure 5*

The police were at risk of losing the line.  As the crowd pushed, rioters can be heard yelling, "Here we go!", indicating they felt the police line was about to break. The crowd indeed gained ground and pushed the line of police officers back.  Bratjan can be seen again, this time having moved close to the line of officers, just a few feet from the front line.  *See* Exh. 2, at approx. timestamp 01:32; Figure 6 (Bratjan circled in green).



*Figure 6*

Shortly after this, several people near the officers begin to turn the other way and hold their face and eyes as the police officers appeared to have administered chemical crowd control munitions. Only when chemical irritants were deployed did the crowd subside. Bratjan has admitted that he felt the effects of pepper spray while he was inside the building, very likely during this incident.

Bratjan left through the nearby Rotunda doors, on the east side of the building, at approximately 2:27 p.m.. *See* Figure 7 (USCP CCTV footage) (Bratjan circled in green).



*Figure 7*



*Figure 8*

Later that day, Bratjan posted to his Instagram about the events, claiming he "[a]pproached the Capitol Building with an army of American patriots. With war vets leading the way, we stormed up those steps and into the halls. I've never been pepper sprayed or [t]ear gassed, and I'm

hoping I'll never have to again." He added, "[h]opefully our message to Congress was received. We didn't elect them to carry out their own agenda, we elected each and every one to carry our agenda!" Along with the post was a picture of the mob on the West plaza.  He concluded with the slogans: "#stopthesteal #saveamerica #trump2020 #patriotism[.]" Figure 9 (Instagram post).



*Figure 9*

Soon after the riot, after Bratjan returned home, he initially bragged about his participation in the event to some of his friends and acquaintances.  They heard his tales and saw his posts on social media, and at least one of them reported it to the FBI.  Based on this, the FBI obtained a screenshot of the Instagram post, above.  But the FBI was unable to locate any evidence of Bratjan's participation in the riot on his existing social media accounts.  Even after obtaining a warrant to search Bratjan's Instagram and Facebook accounts, they obtained no relevant information. This indicates that Bratjan not only removed his public posts about the event, he deleted those references from his accounts altogether.

*Bratjan's Interview with FBI Agents*

On June 14, 2022, agents approached Bratjan at his workplace and asked to speak with him. They had a warrant for his arrest and to search his home, and they informed him of his *Miranda* rights before the interview began. Bratjan agreed to be interviewed, and immediately indicated his willingness to cooperate with investigators. He began offering truthful information about his role in the riot at the U.S. Capitol on January 6. He admitted he went inside the building, unauthorized. He acknowledged the violence and destruction that surrounded him and admitted going inside despite those warnings. He described himself as hesitant but too curious to resist going inside. Once there, he found that the crowd was belligerent, brutal, and loud, and the environment was "gross." Exh. 1, at approx. timestamp 09:50 – 10:15.[1] He said he went to the Capitol thinking it would be a huge historical moment, where he would chant and be heard.  But he admitted he knew there would be people there who would act out.

---

[1] The interview, which lasted approximately 35 minutes, was audio-recorded by the FBI.  After approximately 21 minutes, however, the recording device failed.  As a result, the audio file attached as Exhibit 1 includes only the first 21 minutes of the interview.  A report of the full interview, prepared by one of the interviewing agents, is attached as Exhibit 3.

Bratjan told the interviewing agents that he was sorry he had jumped through a broken window to gain access to the building, and he conceded that this may have led him to think he shouldn't go inside. But he explained he thought that this would never "come back to bite me," because he was wearing a mask that obscured his face and he was part of a big, shoulder-to-shoulder crowd. *See* Exh. 1 at approx. timestamp 13:30 to 14:00.

*The Charges and Plea Agreement*

On June 8, 2022, the United States charged Bratjan by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On June 14, 2022, law enforcement officers arrested him at his workplace near Minneapolis, Minnesota. The same morning, agents executed a search warrant at Bratjan's residence. Shortly after his initial appearance in Minnesota, Bratjan, through counsel, indicated his intention to plead guilty. On August 24, 2022, pursuant to a plea agreement with the United States, the United States charged Bratjan by a one-count Information with violating 40 U.S.C. § 5104(e)(2)(G). He is scheduled to enter a guilty plea and proceed directly to sentencing on September 14, 2022, before this Court. Bratjan has agreed to pay $500 in restitution to the Department of the Treasury.

### III.    Statutory Penalties

After his plea is entered, Frank Bratjan will face sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement, Bratjan faces up to six months of imprisonment and a fine of up to $5,000. Bratjan must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

12

IV.     **Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6).

The government understands that no presentence investigation will be ordered and no report will be prepared in this case, pursuant to the Court's Standing Order for Misdemeanor Cases, Dkt. No. 16.  To proceed without a presentence investigation, the Court must make a finding that the information in the record will enable the Court to meaningfully exercise its sentencing authority under 18 U.S.C. §3553.  *See* Fed. R. Crim. Pro. 32(c)(1)(A)(ii) (providing an exception to the requirement that a probation officer conduct a presentence investigation before the Court conducts sentencing where the Court finds that the information in the record enables it to meaningfully exercise its sentencing authority "and the court explains its finding on the record").

In this case, as described below, the Section 3553(a) factors weigh in favor of 14 days imprisonment as part of 36 months of probation.

**A.  The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol, on January 6, 2021 was a crime unparalleled in American history and defies comparison to other violent riots. It represented a grave threat to our democratic norms and practices. Indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.

While each defendant must be sentenced based on their own conduct, this Court should take into account that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances. As they entered the Capitol, they very likely crossed through numerous barriers and barricades and heard the violent outcries of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting between the rioters and police and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while assessing Bratjan's individual conduct and fashioning a just sentence, this Court should look to a number of critical aggravating and mitigating factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) defendant's reaction to acts of violence or destruction; (5) whether, during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from police officers; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had Bratjan personally engaged in violence or destruction, he or she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts by Bratjan is therefore not a mitigating factor in this misdemeanor case.

There is no indication that Bratjan was preparing for violence in advance of January 6. Bratjan told the FBI agents he was there to use his voice to chant for his cause, and he did not know ahead of time that violence would erupt as it did. But Bratjan saw the violence unfolding around him *before* he advanced to the threshold of the building; *before* he climbed through a

broken window, jumping onto a pile of shattered glass as intruder alarms blared; *before* he climbed the stairs inside the building to reach the second floor; and *before* he joined a mob attempting to push through the police line attempting to guard Mitch McConnell's office and the floor of the Senate. He experienced any number of warnings that should have led him to leave immediately, and yet he pressed on.

Bratjan likely pressed forward because he was there with a purpose: to defeat Congress's effort to lawfully certify the results of the 2020 election. Bratjan wanted the outcome to have been different. And rather than exercise the rights afforded to all citizens to exercise their voices and their votes, he broke the law, and took matters into his own hands—along with an "army" of like-minded criminals. His Instagram post immediately after the riot indicates his lack of remorse and his failure to understand the immense consequences of his actions.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence that includes a modest but meaningful period of incarceration to address the seriousness of Bratjan's crimes.

### B.  Bratjan's History and Characteristics

Bratjan works a stable job as an employee of the U.S. Postal Service. He lives in his own apartment but has spent time in the recent past living with each of his parents in New York and in Minnesota. It appears he has family support and stable income. He has no known criminal history. When confronted with evidence of his participation in this offense, he was immediately contrite and quickly took responsibility for his actions.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and

appalling disregard for our institutions of government and the orderly administration of the democratic process."[2] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic

---

[2] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge

Moss during sentencing in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to
> attack the Capitol to prevent our elected officials from both parties from performing
> their constitutional and statutory duty, democracy is in trouble. The damage that
> [[Defendant Last Name]] and others caused that day goes way beyond the several-
> hour delay in the certification. It is a damage that will persist in this country for
> decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven

months ago for the United States and our diplomats to convince other nations to pursue democracy.

It means that it will be harder for all of us to convince our children and our grandchildren that

democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I

don't think that any plausible argument can be made defending what happened in the Capitol on

January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is

important to convey to future potential rioters—especially those who intend to improperly

influence the democratic process—that their actions will have consequences. There is possibly no

greater factor that this Court must consider.

*Specific Deterrence*

Frank Bratjan's actions on January 6 highlight the need for deterrence in this case.  Despite

all the indications of danger, despite the violence, chaos, broken glass, pepper spray, alarms, and

flash bangs, he charged forward to storm the Capitol building.  And his celebratory post, followed

by his decision to delete records from his online accounts, suggest that he did not immediately

grasp the seriousness of his actions.  On the other hand, Bratjan quickly accepted responsibility

once confronted with the evidence against him, and his lack of criminal history suggests he may

quickly learn from this grave mistake not to engage in criminal behavior in the future.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

The government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This Court must sentence Bratjan based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot. Although those like Bratjan convicted of misdemeanors are generally less culpable than defendants convicted of felonies, misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes. A probationary sentence should not be the default."[4] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth at sentencing). Accord, *United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 (statement of Judge Friedman).

Bratjan has pleaded guilty to the one-count Information, charging him with Parading, Demonstrating, and Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

---

[3] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[4] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. Avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch

of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against police officers, and large number of victims. Thus, even though many of defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, this Court should consider the sentence of 20 days of intermittent confinement on consecutive weekends as a condition of 24 months' probation imposed in *United States v. Andrew Ericson*, D.D.C. 1:21-cr-00506. Ericson was inside the Capitol building for only about 15 minutes but entered Speaker Nancy Pelosi's conference room and posted a photo of himself with his feet on the conference table and took a beer from the fridge. Ericson recorded his presence in and around the Capitol and posted it on Snapchat while cheering on the criminal activity he was witnessing. He later deleted his Facebook and Snapchat accounts—similar to Bratjan, who removed evidence of his participation in the events. Like Bratjan, Ericson expressed remorse for his conduct on January 6 when he was interviewed by FBI agents, and pleaded guilty to a single count of violating 40 U.S.C. § 5104()(2)(G). Although Bratjan did not enter any sensitive or private office spaces January 6, he was with a group of rioters who pushed against and nearly breached a line of police officers near Senator McConnell's office. And unlike Ericson, he came nearly face to face with police officers seeking to prevent the rioters from advancing.

The goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that

"different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently— differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.   This Court Has Authority To Impose A Split Sentence In This Class B Misdemeanor Case

As nine judges of this District have now concluded, this Court has the authority under 18 § 3561(a)(3) to impose a "split sentence," *i.e.*, a sentence requiring both a term of imprisonment and a term of probation, on a defendant who has been convicted of a "petty offense." *See, e.g.*, *United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case), *appeal pending*, D.C. Circuit No. 22-3018; ; *United States v. Sarko*, 21-cr-591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, 21-cr-342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21-cr-630 (CJN), ECF 37 (D.D.C. April 22, 2022) (imposing split sentence); *United States v. Entrekin*, 21-cr-686 (FYP), ECF 34 (D.D.C. May 6, 2022) (imposing split sentence); *United States v. Revlett*, 21-cr-281 (JEB) ECF 46 (D.D.C. July 7, 2022) (imposing split sentence); *United States*

*v. Getsinger*, 21-cr-607 (EGS), ECF 60 (D.D.C. July 12, 2022) (imposing split sentences); *United States v. Ticas*, 21-cr-00601 (JDB), ECF 40 (D.D.C. July 15, 2022).[5]

If this Court elects to impose a term of intermittent incarceration in this case, as it did in *Ericson* and as the government recommends, it need not decide that question in this case because there is no dispute that such a defendant can be required to "remain in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release." 18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration imprisonment as a condition of probation in one of two ways.  S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over weekends or at night. *Id*. Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id*.

Moreover, this Court could impose an uninterrupted term of up to fourteen days incarceration as a condition of probation. Although the statute does not define an "interval of time," case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time.  *See United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar.

---

[5] In *United States v. Lindsey*, 21-cr-162 (BAH), ECF 102, the defendant pleaded guilty to three counts: 18 U.S.C. § 1752(a)(1); 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G). Chief Judge Howell sentenced Lindsey to five months incarceration on each of the § 5104 counts, to be served concurrently, and 36 months' probation on the § 1752(a)(1) count.

18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also United States v. Anderson*, 787 F. Supp. 537, 538 (D. Md. 1992) (continuous 60-day incarceration not appropriate as a condition of probation).  A 14-day term of imprisonment is therefore permissible under Section 3563(b)(10). *See United States v. Stenz*, 21-cr-456 (BAH) ECF 38 (D.D.C. Feb. 17, 2022) (imposing imprisonment under Section 3563(b)(10); *United States v. Schornak*, 21-cr-278 (BAH) ECF 71 (D.D.C. Feb. 18. 2022) (same); *United States v. Herendeen*, 21-cr-278 (BAH) ECF 87 (D.D.C. Apr. 1, 2022) (same); *United States v. McCreary*, 21-cr-125 (BAH) ECF 46 (D.D.C. Apr. 1, 2022) (same); *United States v. Reed*, 21-cr-204 (BAH) ECF 178 (D.D.C. Apr. 14, 2022) (same); *United States v. Watrous*, 21-cr-627 (BAH) ECF 40 (D.D.C. Apr. 21, 2022) (same); *United States v. Vuksana*j, 21-cr-620 (BAH) ECF D.D.C. Apr. 29, 2022) (43 (same); *United States v. Heinl*, 21-cr-370 (EGS) ECF 43 (D.D.C. June 8, 2022) ECF 43  (same); *United States v. Cameron*, 22-cr-17 (TFH) ECF 36 (same).

No court appears to have decided whether a term of continuous imprisonment greater than two weeks but less than 30 days is consistent with Section 3563(b)(10), and the government does not advocate such a sentence here. Practical concerns with multiple short terms of intermittent confinement (i.e., nights and weekends in jail), which would require repeated entries and departures from a detention facility during the COVID-19 pandemic, thereby increasing the risk of spreading contagion in the facility, may militate against imposing this type of "intermittent" confinement.  For that reason, any 14-day term of imprisonment imposed as a condition of probation under Section 3563(b)(10) should be ordered to be served without interruption.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence defendant Frank Bratjan to 14 days imprisonment as part of 36 months of probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing meaningful restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    /s/ *Emily W. Allen*
EMILY W. ALLEN, Cal. Bar No. 234961
Assistant United States Attorney
601 D Street, N.W.
Washington, DC 20530
emily.allen@usdoj.gov
(907) 271-4724